Filed 1/23/23 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOHN'S GRILL, INC., et al.,<br><br>    Plaintiffs and Appellants,<br><br>              v.<br><br>THE HARTFORD FINANCIAL SERVICES GROUP, INC., et al.,<br><br>    Defendants and Respondents. | A162709<br><br>(San Francisco Super. Ct. No. CGC-20-584184)<br><br>**ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT** |

On its own motion, this court orders that the December 27, 2022 opinion be modified as follows:

1.  On page 10, in the first paragraph under subheading "1. Insurance Policy Interpretation", in the parenthetical after the first sentence of text, insert as the first citation in the parenthetical, "*Yahoo Inc. v. National Union Fire Ins. Co.* (2022) 14 Cal.5th 58, 67 (*Yahoo*);" so that the sentence and the following parenthetical read:

    > Because insurance policies are contracts, judicial interpretation of them, like any other contract, is a question of law. (*Yahoo Inc. v. National Union Fire Ins. Co.* (2022) 14 Cal.5th 58, 67 (*Yahoo*); *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 818; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 ["While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply."].)

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.

2. On page 10, also in the first paragraph under the subheading "1. Insurance Policy Interpretation", in the parenthetical after the second and third sentences of text, insert as the second citation in the parenthetical, "; *Yahoo, supra,* at p. 67" so that the sentences and the following parenthetical read:

> The "mutual intention of the parties at the time the contract is formed governs interpretation.  [Citation.]  Such intent is to be inferred, if possible, solely from the written provisions of the contract."  (*AIU Ins. Co.,* at pp. 821–822; *Yahoo, supra,* at p. 67.)

3. On page 10, also in the first paragraph under the subheading "1. Insurance Policy Interpretation", in the parenthetical at the end of that paragraph, insert as the concluding citations in the parenthetical, "; *Yahoo, supra,* at p. 67 [if policy terms " 'are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' "  [Citations.]  Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer.' "]; *Yahoo,* at p. 69" so that the concluding sentence and the following parenthetical read:

> Any ambiguous terms must be interpreted "in the sense [the insurer] believed [the insured] understood them at the time of formation," and ambiguities must be resolved in favor of coverage.  (*AIU Ins. Co.,* at p. 822, citing Civ. Code, § 1649; *Yahoo, supra,* at p. 67 [if policy terms " 'are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' "  [Citations.]  Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer.' "]; *Yahoo,* at p. 69.)

4. On page 11, in the first paragraph (which begins, " "The rules for recognizing ambiguity are . . ." "), in the parenthetical after the multi-sentence quotation, insert as the second citation in the parenthetical, "; accord, *Yahoo, supra,* 14 Cal.5th at p. 69 ["the meaning of the word or phrase must be considered in light of its context"]" so that the parenthetical reads:

(*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 737; accord, *Yahoo*, *supra*, 14 Cal.5th at p. 69 ["the meaning of the word or phrase must be considered in light of its context"].)

5. On page 11, in the second paragraph (which begins, "Insurance policies typically contain"), in the parenthetical after the second sentence of text, insert as the second citation in the parenthetical, "; accord, *Yahoo*, *supra*, 14 Cal.5th at pp. 67, 69" so that the sentence and the following parenthetical read:

> The grant of coverage is generally interpreted broadly in favor of the insured to protect the objectively reasonable expectations of the insured.  (*AIU Ins. Co. v. Superior Court*, *supra*, 51 Cal.3d at p. 822; accord, *Yahoo*, *supra*, 14 Cal.5th at pp. 67, 69.)

6. On page 12, in the first full paragraph (which begins, "The insurer bears the burden"), in the parenthetical after the first sentence, insert as the first citation in the parenthetical, "*Yahoo*, *supra*, 14 Cal.5th at p. 68;" so that the sentence and the following parenthetical read:

> The insurer bears the burden of proving that an exclusionary clause applies.  (*Yahoo*, *supra*, 14 Cal.5th at p. 68; *Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1453.)

7. On page 12, also in the first full paragraph (which begins, "The insurer bears the burden"), in the parenthetical at the end of the paragraph, insert as the second citation in the parenthetical, "; accord, *Yahoo*, *supra*, at p. 68 ["When coverage is in dispute, the initial burden is on the insured . . . to prove that its claim falls within the scope of potential coverage.  [Citation.]  If the insured establishes that the policy provides at least the potential for coverage, the burden shifts to the insurer . . . to show the claim falls within one of the policy's exclusions."].)" so that the parenthetical reads:

> (*Hallmark Ins. Co. v. Superior Court* (1988) 201 Cal.App.3d 1014, 1017; accord, *Yahoo*, *supra*, at p. 68 ["When coverage is in dispute, the initial burden is on the insured . . . to prove that its claim falls within the scope of potential coverage.  [Citation.]  If the insured establishes that the policy provides at least the potential for coverage, the burden shifts to the insurer . . . to show the claim falls within one of the policy's exclusions."].)

8. On page 28, in the first full paragraph (which begins, "Sentinel acknowledges the more expansive breadth"), after the last sentence of the paragraph, insert a parenthetical stating, "(See *Yahoo*, *supra*, 14 Cal.5th at pp. 65, 68, 71, 72 [endorsement significantly modified standard version of policy, including by removing an otherwise applicable exclusion].)" so that the sentence and the parenthetical citation read:

> They modify the main body of an otherwise standardized form, thereby customizing it for purposes of the endorsement, which is an objective the parties to this insurance contract plainly had, given the tailored nature of several of the endorsements they agreed upon. (See *Yahoo*, *supra*, 14 Cal.5th at pp. 65, 68, 71, 72 [endorsement significantly modified standard version of policy, including by removing an otherwise applicable exclusion].)

9. On page 30, in the paragraph that begins on page 29 with the words, "We are prepared to accept", after the second sentence of text, insert a parenthetical stating, "(See *Yahoo*, *supra*, 14 Cal.5th at pp. 65, 68, 71, 72 [endorsement modified standard policy].)" so that the sentence and the parenthetical citation read:

> But at best for Sentinel, the Policy is ambiguous when read in light of the modifications made by the Limited Fungi or Virus Coverage Endorsement. (See *Yahoo*, *supra*, 14 Cal.5th at pp. 65, 68, 71, 72 [endorsement modified standard policy].)

The modifications effect no change in the judgment.


Dated: January 23, 2023                                          STREETER, Acting P. J.

Trial Court: Superior Court of California, County of San Francisco

Trial Judge: Hon. Ethan P. Schulman

Counsel: Cotchett, Pitre & McCarthy, Nanci E. Nishimura, Brian Danitz, Andrew F. Kirtley, Julia Q. Peng, for Plaintiffs and Appellants.

Steptoe & Johnson, Anthony J. Anscombe; Wiggin and Dana, Tadhg Dooley, David R. Roth, for Defendants and Respondents.

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOHN'S GRILL, INC., et al., | |
| Plaintiffs and Appellants, | A162709 |
| v. | (San Francisco Super. Ct. |
| THE HARTFORD FINANCIAL SERVICES GROUP, INC., et al., | No. CGC-20-584184) |
| Defendants and Respondents. | |

John's Grill, Inc. and its owner John Konstin (collectively, John's Grill) appeal from the trial court's orders (1) sustaining Sentinel Insurance Company, Ltd. (Sentinel)'s demurrer without leave to amend, and (2) granting The Hartford Financial Services Group, Inc. (HFSG)'s motion to quash service of summons.

John's Grill alleges that Sentinel and HFSG wrongfully denied its claim for business interruption coverage for losses sustained in connection with the COVID-19 pandemic. The trial court sustained Sentinel's demurrer on the ground that its business insurance policy affords no coverage for the claim, and granted the motion to quash on the ground that John's Grill failed to show personal jurisdiction over HFSG. In the unpublished portion of this opinion, we conclude that the trial court correctly granted the motion to quash, and in the published portion of the opinion, we conclude that the court erred in sustaining the demurrer without leave to amend.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.

1

On the merits, we write in a rapidly evolving area of law. Over the last 18 months, a nearly uniform line of cases in California and across the country holds that temporary loss of use of property due to the COVID-19 pandemic does not constitute "direct physical loss of or damage to" property for purposes of first party insurance coverage. (See *Apple Annie, LLC v. Oregon Mutual Ins. Co.* (2022) 82 Cal.App.5th 919, 930–935 [summarizing cases].) But nearly all of these cases turn on standard form language that was not customized in any material way by modifying endorsement.

The twist in this case is that Sentinel's policy has customized trigger-of-coverage language that is virus-specific. Unlike the undefined term "direct physical loss of or damage to" property in almost all of the COVID-19 business interruption cases decided to date, Sentinel's policy, by endorsement, (1) contains an affirmative grant of coverage specifically for "loss or damage" caused by a virus, and (2) a special definition of "loss or damage" that includes "[d]irect physical loss or direct physical damage to" property, but is broad enough to encompass pervasive infiltration of virus particulates onto the surfaces of covered property, which is what is alleged here.

Although Sentinel's grant of coverage for property "loss or damage" caused by virus is expressly limited—principally by a condition that makes it applicable only if the virus is the "result of" one of a number of listed causes, none of which John's Grill has alleged—the specified causes clause in Sentinel's limited virus coverage endorsement, applied broadly, as Sentinel proposes to apply it here, effectively transforms the limited grant of coverage for virus-caused "loss or damage" into an empty promise. On this record, we conclude that it is unenforceable under the illusory coverage doctrine.

# I. BACKGROUND

## A. *The Parties and the Policy*

John's Grill owns and operates a restaurant in downtown San Francisco. On March 16, 2020, in response to the COVID-19 pandemic, the City and County of San Francisco issued a shelter-in-place order that required nonessential businesses to close and restaurants to suspend in-person dining. Subsequent orders were issued that permitted limited indoor and outdoor dining beginning in September 2020. As a result of these orders and the presence of COVID-19 on its premises, John's Grill either had to remain closed or operate at a limited capacity.

Sentinel issued a "Spectrum Business Owner's Policy" to John's Grill for the policy period of November 1, 2019 to November 1, 2020 (the Policy). In a mammoth, 217-page document, the Policy provides a variety of different types of commercial insurance to John's Grill, including first party property coverage in a Special Property Coverage Form, third party liability coverage in a Business Liability Coverage Form, and umbrella liability coverage in an Umbrella Liability Supplemental Contract. All of these coverages are preceded by a Declarations summary stating per claim and per occurrence limitations, and by various Common Conditions of coverage. Within each form of coverage is an insuring agreement, various standard definitions, exclusions, additional coverages, and coverage extensions. There are also modifying endorsements that customize the respective coverages in different ways, including a number of modifications tailored specially to a restaurant business.[1]

---

[1] These modifications, set forth in an endorsement entitled "Super Stretch for Restaurants," apply specifically to the Special Property Coverage Form.

3

The Special Property Coverage Form is structured to provide all "Perils" coverage, meaning all risks of physical loss or damage are covered unless subject to a specific exception or exclusion.[2]  At issue here is the first party property insurance provided under two endorsements that modify the Special Property Coverage Form:  (1) an "Actual Loss Sustained Business Income & Expense—Specified Limit Coverage" endorsement providing coverage for losses due to suspended operations (the Lost Business Income and Extra Expense Endorsement), and (2) a "Limited Fungi, Bacteria or Virus Coverage" endorsement (the Limited Fungi or Virus Coverage Endorsement).

The most pertinent of these two endorsements is the Limited Fungi or Virus Coverage Endorsement, which includes provisions (1) that add limited coverage in certain circumstances for "loss or damage" "caused by" "virus" (the Limited Virus Coverage), subject to certain conditions requiring that the virus was the "result of" one or more of a list of enumerated causes (the Specified Causes Clause), and (2) that exclude any "loss or damage caused directly or indirectly by" the "[p]resence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus" (the Virus Exclusion), subject to an exception where the loss or damage falls within the Limited Virus Coverage.  Although we are presented with an issue of personal jurisdiction as a threshold matter, how to reconcile the Limited Virus Coverage with the Virus Exclusion is at the heart of the appeal on the merits.

---

[2] An endorsement entitled "Perils Specifically Excepted" provides that, "As used herein, 'Peril' means a cause of physical loss or damage to property." Paragraphs A and B of the endorsement go on to list a series of "excepted" "Perils."  And Paragraph B of the Special Property Coverage Form sets forth a list of exclusions.

4

**B. *The Proceedings in the Trial Court***

Within days of what is now commonly known as the Great Shutdown due to the COVID-19 virus in late March 2020, John's Grill submitted a claim to Sentinel for lost business income under the Lost Business Income and Extra Expense Endorsement. The response came rapidly. On April 6, 2020, Sentinel issued a letter denying the claim.

Sentinel's declination letter explained that "since the coronavirus did not cause property damage at your place of business or in the immediate area, this business income loss is not covered." The letter further stated that even if there was property damage, such damage was excluded from the Policy and that the limited coverage for damage caused by virus did not apply.

On April 15, 2020, John's Grill brought suit against Sentinel and HFSG,[3] alleging causes of action for breach of contract, bad faith denial of insurance coverage, unfair business practices, fraud, and declaratory relief. John's Grill claimed coverage under the Civil Authority, Limited Virus Coverage, Lost Business Income and Extra Expense provisions of the Policy. Its primary theory of loss was that government orders compelled a shutdown of business operations, but it alleged in the alternative that it suffered sufficient coverage-triggering damage or loss because "physical droplets containing COVID-19" that land on surfaces rendered its business premises

---

[3] Sentinel, not HFSG, is the insurer named on the Policy, but in its opposition to HFSG's motion to quash, John's Grill argued the Policy was drafted and sold by The Hartford (the trade name that is commonly used for HFSG). John's Grill had also named as a defendant Norbay Insurance Services, Inc., the insurance broker that sold the Policy to it. The trial court dismissed Norbay from the case in March 2021. John's Grill does not appeal this dismissal.

5

"unusable" due to the "substantial risk of people getting sick, transmitting infection to others, and possibly dying as a result of touching those surfaces."

Both Sentinel and HFSG filed demurrers. HFSG also filed a motion to quash service of summons for lack of personal jurisdiction. In its demurrer, Sentinel argued that the Virus Exclusion bars coverage for John's Grill's alleged losses and that John's Grill has not alleged any of the listed causes of virus in the Specified Causes Clause. Sentinel further argued that there is no coverage under the Lost Business Income and Extra Expense Endorsement because John's Grill fails to allege physical loss of or physical damage to property.

In its motion to quash service of summons, HFSG argued that it is a holding company and parent corporation that does not underwrite any risks itself and is not authorized to do business in California. It further argued that "The Hartford" (as referenced throughout the Policy) is a trade name belonging to Hartford Fire Insurance Company, not HFSG, and is used by various entities, including Sentinel.

Following a hearing, the trial court sustained Sentinel's demurrer without leave to amend. The trial court held that (i) the Virus Exclusion's plain and unambiguous language excludes coverage for losses caused by COVID-19; (ii) the Limited Virus Coverage does not apply because John's Grill failed to allege the COVID-19 virus "resulted from" a cause listed in the Specified Causes Clause; and (iii) the Specified Causes Clause, while perhaps difficult to meet, does not render the Limited Virus Coverage illusory.

The court also granted HFSG's motion to quash service, holding that John's Grill failed to present sufficient evidence to support specific

6

jurisdiction over HFSG.[4]  Finally, the trial court ruled that HFSG's demurrer was moot in light of its order granting the motion to quash.

Following the trial court's dismissal of the action with prejudice as to both Sentinel and HFSG, John's Grill timely appealed.  In its appeal, John's Grill argues that the trial court erred by sustaining Sentinel's demurrer, and by granting HFSG's motion to quash service of summons.  After full briefing, argument and submission of the appeal, the parties notified us that they reached a settlement (Cal. Rules of Court, rule 8.244(a)) and stipulated to dismissal (*id.*, rule 8.244(c)).

"On receipt of a request or stipulation to dismiss, the court *may* dismiss the appeal and direct immediate issuance of the remittitur."  (Cal. Rules of Court, rule 8.244(c)(2), italics added; see *City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114, 1121, fn. 5 ["After the record on appeal is filed, dismissal of the action based on abandonment or stipulation of the parties is discretionary, rather than mandatory."].)

Because this appeal raises issues "of continuing public interest which are likely to recur" (*Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 445, fn. 2; see *Lucich v. City of Oakland* (1993) 19 Cal.App.4th 494, 500–502), we decline to dismiss at this late stage in the appellate proceedings and proceed to file our opinion.  Below, we conclude that the court properly granted HFSG's motion to quash, but that it erred in sustaining Sentinel's demurrer without leave to amend.

---

[4] In its motion to quash, HFSG argued that the court lacked both general jurisdiction and specific jurisdiction.  In its opposition and opening brief on appeal, John's Grill only argues that specific jurisdiction exists over HFSG.  John's Grill does not dispute that the court lacks general jurisdiction.

## II. ANALYSIS

### A. *The Motion To Quash*

We address first whether the trial court erred in granting HFSG's motion to quash service of summons for lack of personal jurisdiction.  We hold that it did not.

"The concept of minimum contacts embraces two types of jurisdiction—general and specific."  (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 536.)  The sole issue here is whether there is a basis to exercise specific jurisdiction.  Specific jurisdiction exists if:  (1) the defendant has purposefully availed itself of forum benefits related to the matter in controversy; (2) the controversy relates to or arises out of the defendant's contacts with the forum; and (3) the exercise of jurisdiction would comport with fair play and substantial justice.  (*Van Buskirk v. Van Buskirk* (2020) 53 Cal.App.5th 523, 531.)  The relationship between the defendant and the forum state "must arise out of contacts that the 'defendant *[it]self*' creates with the forum [s]tate," not out of "contacts between the plaintiff (or third parties) and the forum [s]tate."  (*Walden v. Fiore* (2014) 571 U.S. 277, 284.)

When, as here, a defendant has moved "to quash service of process on jurisdictional grounds, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction" by a preponderance of the evidence.  (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449; *ViaView, Inc. v. Retzlaff* (2016) 1 Cal.App.5th 198, 209–210.)  To satisfy its initial burden, a plaintiff "must come forward with affidavits and other competent evidence . . . and cannot simply rely on allegations in an unverified complaint."  (*ViaView, Inc. v. Retzlaff*, *supra*, at p. 210; see *Rivelli v. Hemm* (2021) 67 Cal.App.5th 380, 393 [jurisdictional allegations must be supported by " 'competent evidence of jurisdictional facts.  Allegations in an unverified complaint are insufficient to satisfy this burden of proof' "].)

8

Here, the superior court held that John's Grill "fail[ed] to present sufficient evidence to show specific jurisdiction against HFSG." We agree. HFSG is not a party to the Policy. It is a holding company that indirectly owns Sentinel. Without alleging or attempting to present proof that Sentinel is the mere alter ego of HFSG, John's Grill alleges that HFSG's corporate affiliation with Sentinel is enough to justify the exercise of personal jurisdiction over HFSG. According to John's Grill, the Policy "is replete with references to and messages from 'The Hartford' " and "The Hartford" maintains a website that invites California-based businesses to purchase insurance from it.

As the superior court found, however, The Hartford is merely a trade name, used by multiple entities and owned by Hartford Fire Insurance Company, not HFSG. The court also found that, since HFSG is not even authorized by the California Department of Insurance to do business in California, HFSG therefore cannot reasonably be confused with "The Hartford" that is referenced in Sentinel's Policy. The court also found that John's Grill failed to show that "discovery is likely to lead to the production of evidence of facts establishing jurisdiction," and having so found, denied a request from John's Grill for jurisdictional discovery. All of these findings are supported by substantial evidence.

## B. *The Demurrer*

We review an order sustaining a demurrer de novo and exercise our independent judgment as to whether the complaint states a cause of action as a matter of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) This extends "even as to matters not expressly ruled upon by the trial court." (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 13.) We accept as true all material facts properly pleaded and matters which may be judicially noticed but disregard

9

contentions, deductions, or conclusions of fact or law. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) We "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Ibid.*)

"When a demurrer is sustained without leave to amend, it is the duty of the reviewing court to decide whether there is a reasonable possibility that the defect can be cured by amendment. If it can, the trial court has abused its discretion and we must reverse. If it cannot be reasonably cured, there has been no abuse of discretion. [Citation.] It is the plaintiff's burden to show the reviewing court how the complaint can be amended to state a cause of action." (*Michaelian v. State Comp. Ins. Fund* (1996) 50 Cal.App.4th 1093, 1105.)

## 1. Insurance Policy Interpretation

Because insurance policies are contracts, judicial interpretation of them, like any other contract, is a question of law. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 818; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 ["While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply."].) The "mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract." (*AIU Ins. Co.*, at pp. 821–822.) The words in the contract are to be interpreted in their "ordinary and popular sense" unless "used by the parties in a technical sense, or unless a special meaning is given to them by usage." (Civ. Code, § 1644.) Any ambiguous terms must be interpreted "in the sense [the insurer] believed [the insured] understood them at the time of formation," and ambiguities must be resolved in favor of coverage. (*AIU Ins. Co.*, at p. 822, citing Civ. Code, § 1649.)

10

"The rules for recognizing ambiguity are . . . straightforward. Ambiguity exists when an insurance policy provision is susceptible to two or more constructions that are reasonable and not based on strained interpretations. (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912.) Contract language interpretation involves considering the whole instrument and the circumstances of the case; ambiguity is not an abstract question. (*Id.* at p. 916, fn. 7.) 'A word generally has several meanings, even in the dictionary. You have to consider the sentence in which it stands to decide which of those meanings it bears in the particular case, and very likely will see that it there has a shade of significance more refined than any given in the wordbook.' (Holmes, *The Theory of Legal Interpretation* (1899) 12 Harv. L.Rev. 417.)" (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 737.) Under this basic precept, every insurance contract must be interpreted by its particular wording and read in its entirety, with careful attention paid to context, the interrelationship of the provisions within the policy and how they work together, and the actual circumstances of the contracting parties.

Insurance policies typically contain two main components: on the one hand, provisions that specify the risks being covered and thus that mark out the affirmative grant of coverage, and on the other hand, exclusionary provisions that "remove coverage for certain risks which are initially within the insuring clause." (*Collin v. American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 802–803.) The grant of coverage is generally interpreted broadly in favor of the insured to protect the objectively reasonable expectations of the insured. (*AIU Ins. Co. v. Superior Court, supra*, 51 Cal.3d at p. 822.) And exclusionary provisions that limit or take away coverage are "strictly construed against the insurer and liberally interpreted in favor of

11

the insured" (*Delgado v. Heritage Life Ins. Co.* (1984) 157 Cal.App.3d 262, 271), while exceptions to exclusions are broadly construed in favor of the insured (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 471).

The insurer bears the burden of proving that an exclusionary clause applies. (*Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1453.) Before exclusionary provisions are even considered, however, "a court must examine the coverage provisions to determine whether a claim falls within the potential ambit of the insurance. [Citations.] Where the scope of the basic coverage itself clearly creates no potential liability under the policy, a court may not give it a 'strained construction' to impose on an insurer a liability the insurer has not assumed. [Citation.] The burden is on the insured to prove that an event is a claim which falls within the basic coverage of the insurance." (*Hallmark Ins. Co. v. Superior Court* (1988) 201 Cal.App.3d 1014, 1017.)

The phrase " 'trigger of coverage' " is a "term of 'convenience' " used to denote the occurrence of an event that " 'must happen in the policy period in order for the potential of coverage to arise. The issue is largely one of timing—what must take place within the policy's effective dates for the potential of coverage to be "triggered"?' " (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 196, italics omitted; see *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 655, fn. 2.) But the occurrence of a coverage-triggering event simply means the insured *may* be entitled to coverage benefits. The remainder of the analysis requires consideration of whether limiting conditions to coverage have been satisfied or an exclusion applies. There is no need to consider these additional issues

12

when an occurrence is not within the scope of the insuring clause in the first instance. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 16.)

## 2. The Main Grant of First Party Coverage in the Special Property Coverage Form

The insuring agreement in the Special Property Coverage Form states that Sentinel "will pay for direct physical loss of or physical damage to Covered Property . . . caused by or resulting from a Covered Cause of Loss." The Policy provides additional coverages that supplement this basic grant of first party coverage, including under the Lost Business Income and Extra Expense Endorsement.[5] When applicable, the Lost Business Income and

_____

[5] John's Grill alleges that the Lost Business Income and Extra Expense coverages may be found at Subparagraphs A.5.o. and A.5.q. of the Special Property Coverage Form. But the Policy itself—which is attached to and incorporated in the operative complaint—shows that these provisions were replaced by an endorsement titled "Actual Loss Sustained Business Income & Extra Expense—Specified Limit Coverage." Absent this modifying change, the business interruption coverage provided by the Special Property Coverage Form was "not subject to the Limits of Insurance" stated in the Declarations. (See Subparagraph A.5.o.; see also Subparagraph A.5.p.(3)(c).ii. [same for Extra Expenses].) Effectively, the applicable limit was temporal: Lost Business Income and Extra Expense losses occurring "within 12 consecutive months after the date of direct physical loss or physical damage" and within 24 months after the inception of the Policy were covered.

The language of the Lost Business Income and Extra Expense Endorsement tracks the original form language in Subparagraphs A.5.o. and A.5.q. of the Special Property Coverage Form, but modifies it by adding a "Specified Limit" ($50,000 per occurrence and $4,000,000 total) indicated in the Declarations summary. The fact that the replacement language is virtually identical to the original form language presumably explains why in the main briefs none of the parties draws attention to it. In a supplemental briefing order, we asked the parties to address the Lost Business Income and Extra Expense Endorsement, among other things. The supplemental briefs confirm that, while the parties disagree about whether John's Grill's claim in this case is covered under any provisions of the Policy, there is no dispute

13

Extra Expense Endorsement covers net business interruption losses—subject to specified limits—incurred due to suspended business operations caused by a covered event of "physical loss of or physical damage to" covered property, together with expenses incurred to mitigate such losses or damage.

The lost business income provision affords coverage for "the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' The suspension must be caused by direct physical loss of or physical damage to property at the 'scheduled premises' . . . caused by or resulting from a Covered Cause of Loss." The Extra Expense provision provides coverage for "reasonable and necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage to property . . . ." Thus, the grant of business interruption coverage in the Lost Business Income and Extra Expense Endorsement—at least before customizing endorsement language is considered—parallels the main grant of first party coverage by requiring "physical" impairment and by contemplating a "period of restoration" of physically impaired property.

Faced with similar policy language in cases involving claims for business interruption losses sustained during the COVID-19 pandemic, many courts have ruled for the insurer under California insurance coverage law. These cases all conclude that " 'direct physical loss of or damage to' property" requires a " 'distinct, demonstrable, physical alteration of the property' " and cannot be synonymous with mere " 'loss of use.' " (*Mudpie, Inc. v. Travelers Casualty Ins. Co.* (9th Cir. 2021) 15 F.4th 885, 892; see *Apple Annie, LLC v.*

_____

that John's Grill seeks coverage in this case under the Lost Business Income and Extra Expense Endorsement, not under Subparagraphs A.5.o. and A.5.q. of the Special Property Coverage Form.

14

*Oregon Mutual Ins. Co.*, *supra*, 82 Cal.App.5th at pp. 930–935; *United Talent Agency v. Vigilant Ins. Co.* (2022) 77 Cal.App.5th 821, 830; *Musso & Frank Grill Co., Inc. v. Mitsui Sumitomo Ins. USA Inc.* (2022) 77 Cal.App.5th 753; *Inns-by-the-Sea v. California Mutual Ins. Co.* (2021) 71 Cal.App.5th 688 (*Inns-by-the-Sea*).[6] In recent months some courts have held that the issue of "physical" loss or damage cannot be decided as a pleading matter where the insured alleges a scientifically supportable theory of virus-caused alteration of property (see *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.* (2022) 81 Cal.App.5th 96; cf. also *Huntington Ingalls Industries v. Ace American Ins. Co.*, 2022 VT 45 [applying Vermont law]), but even this strain of authority accepts (or at least assumes) the *Mudpie* premise that coverage can only be triggered by some form of physical alteration of property.

As one federal district court in the *Mudpie* line recently put it, if "a sick person walked into one of Plaintiffs' restaurants and left behind COVID-19 particulates on a countertop, it would strain credulity to say that the countertop was damaged or physically altered as a result." (*Unmasked Mngt.*

---

[6] The *Mudpie* line of cases applying California law is consistent with a nearly uniform trend across the country, primarily in federal diversity cases. (See, e.g., *Q Clothier New Orleans v. Twin City Fire Ins.* (5th Cir. 2022) 29 F.4th 252, 259; *Uncork & Create LLC v. Cincinnati Ins. Co.* (4th Cir. 2022) 27 F.4th 926, 933–934; *10012 Holdings, Inc. v. Sentinel Ins. Co.* (2d Cir. 2021) 21 F.4th 216, 220–223; *Santo's Italian Café LLC v. Acuity Ins. Co.* (6th Cir. 2021) 15 F.4th 398, 401; *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.* (7th Cir. 2021) 20 F.4th 327, 335; *Oral Surgeons, P.C. v. Cincinnati Ins. Co.* (8th Cir. 2021) 2 F.4th 1141, 1144, 1145, fn. 3; *Goodwill Industries v. Philadelphia Indemnity* (10th Cir. 2021) 21 F.4th 704, 710; see also *Neuro-Communication Servs. v. Cincinnati Ins. Co.*, 2022-Ohio-4379, ¶ 17; *Verveine Corp. v. Strathmore Insurance* (Mass. 2022) 184 N.E.3d 1266, 1275–1277; *AC Ocean Walk, LLC v. American Guarantee and Liability Ins. Co.* (N.J. Super.Ct.App.Div., June 23, 2022, No. A-1824-21) 2022 WL 2254864, *11–*12.)

*v. Century-National Insurance Co.* (S.D.Cal. 2021) 514 F.Supp.3d 1217, 1226.)
We know by now that disinfectants provide no cure for the COVID-19 virus
itself—the "debate" about this issue was famously short-lived in 2020—but
we also know (and always did) that disinfectants and other cleaning methods
can be used to eliminate the presence of virus on physical surfaces, which has
been a commonly used precautionary mitigation measure during the
pandemic. But under the *Mudpie* line of cases, as the *Unmasked
Management* court explained, allegations merely "showing the alleged
presence of COVID-19 in or on the covered property are not sufficient to
trigger coverage when direct physical loss of or damage to property is
required" (*id*. at pp. 1225–1226), and thus whatever cleaning or detoxification
efforts may be undertaken do not qualify as "restoration" under standard
first party insurance policies because of the absence of any "physical"
alteration of property.[7]

---

[7] There is a minority view. Some courts have concluded that "direct physical loss or damage" in COVID-19 business interruption coverage cases does not require a distinct, demonstrable physical alteration of property (see, e.g., *Kingray Inc. v. Farmers Group Inc*. (C.D.Cal. 2021) 523 F.Supp.3d 1163, 1173–1174), but so far as we can discern all of the appellate precedent on this point has adopted the contrary view, consistent with *Mudpie* and its progeny. We are also aware that, in the fall of 2021, some noted insurance coverage commentators published an article arguing that courts across the country have, in effect, engaged in a rush-to-judgment against policyholders in COVID-19 business interruption coverage cases. (See, e.g., Lewis et al., *Couch's "Physical Alteration" Fallacy: Its Origins and Consequences* (Fall 2021) 56 Tort Trial & Ins. Prac. L.J. 621 [discussing 10A Couch on Insurance (3d ed. 2016) § 148:46].) This article contends that the reasoning in cases like *Mudpie* is premised on a view expressed in a single treatise, Couch on Insurance, that is contrary to settled law in various areas of first party insurance coverage law predating the COVID-19 pandemic. (Lewis, *supra*, at p. 628 & fn. 36 [discussing cases recognizing first party coverage of claimed losses due to asbestos, odors, and other types of environmental

In this case, the trial court did not address the meaning of "direct physical loss of or physical damage to" property in the Special Property Coverage Form or in the Lost Business Income and Extra Expense Endorsement. Nor did it mention the *Mudpie* line of cases. On appeal, Sentinel defends the order sustaining its demurrer primarily on the grounds the trial court relied upon—that the Virus Exclusion bars coverage, and that John's Grill has failed to allege the COVID-19 on its premises was the "result of" any of the causes in the Specified Causes Clause. Even apart from the obstacles to coverage presented by the Virus Exclusion and the Specified Causes Clause, Sentinel adds in a last line of argument, the operative complaint fails to allege direct physical loss of or physical damage to property, thus precluding coverage as a matter of law under the *Mudpie* line of cases.

John's Grill addresses *Mudpie* in a similarly roundabout way, discussing the issue only in its reply brief and emphasizing that it did allege "direct physical loss of property in the form of deprivation, loss of use, and being unable to use the property for its intended purpose due to . . . the presence of the coronavirus." On the strength of that allegation, John's Grill insists that it "suffer[ed] physical loss of and damage to its property" within the meaning of the Special Property Coverage Form. It also contends that the depth of judicial consensus on the issue addressed in *Mudpie* is overstated by Sentinel. But John's Grill nonetheless urges us to avoid

---

contamination]; see Windt, Insurance Claims and Disputes (6th ed. 2013) §§ 11:40–11:41 [disagreeing with the Couch view].) A similar critique of Couch was addressed and rejected by a Second District, Division Four panel in *United Talent Agency*, *supra*, 77 Cal.App.5th at pages 832–833 ("We . . . decline [the] invitation to depart from the Couch treatise and the case law that relies upon it.").

17

engaging with the *Mudpie* line of cases because of "the absence of a pertinent ruling on the issue" and the limited briefing on it. We are told by John's Grill that "this case [is] a poor vehicle for addressing this important issue of first impression" and that it "would be better addressed by this Court in the context of another pending case in which the physical loss or damage issue was the basis of the decision below and the virtually exclusive focus of the parties' briefing" on appeal.

Thus, while the parties joust with one another over the *Mudpie* line of cases in indirect ways, for different reasons they each focus their attention primarily on the Virus Exclusion and the Limited Virus Coverage. We largely accept that framing of the issues. We say "largely" because the Limited Fungi or Virus Coverage Endorsement must be construed together with the remainder of the Policy, and we think the *Mudpie* line of cases provides an important contextual backdrop and helps inform our analysis of the Policy as a whole. Ultimately, however, we agree that we need not join the fray over whether " 'distinct, demonstrable, physical alteration of . . . property' " is required to trigger coverage under a first party property insurance policy which uses the undefined phrase "physical loss of or damage to" property (*Mudpie, Inc. v. Travelers Casualty Ins. Co.*, *supra*, 15 F.4th at p. 892).

We so conclude not because this appeal is a "poor vehicle" to decide the issues addressed in *Mudpie*. Obviously, we are not a court of discretionary jurisdiction with the ability to pick and choose our cases, and where we wish to disregard nonbinding federal precedent or we have good reason to part ways with sister courts in California, we will not shrink from doing so. But in this case, the *Mudpie* line of cases may be dealt with in a more straightforward way: It is distinguishable. Because the Limited Fungi or

18

Virus Coverage Endorsement adds virus-specific language to the Policy that is not present in COVID-19 business interruption insurance cases involving form language without material modification, those cases involve "very different policy provisions" and are not controlling here. (*Amy's Kitchen, Inc. v. Fireman's Fund Ins. Co.* (2022) 83 Cal.App.5th 1062, 1069 (*Amy's Kitchen*).)

### 3. The Limited Fungi or Virus Coverage Endorsement

#### a. *Summary of Analysis*

The trial court's interpretation and application of the Limited Fungi or Virus Coverage Endorsement adopted the analytical framework Sentinel urged in support of the demurrer and continues to urge here on appeal. We conclude that that approach to analyzing coverage led to error. According to Sentinel, the Virus Exclusion applies by its clear and unambiguous terms; John's Grill fails to allege that any COVID-19 virus on its premises was the "result of" some cause listed in the Specified Causes Clause; and the argument from John's Grill that the Specified Causes Clause is unenforceable under the illusory coverage doctrine lacks merit, just as "every California court to address this argument has held." Only in an alternative, secondary line of reasoning does Sentinel attempt to deal with the scope of the Limited Virus Coverage grant, and then it circles back to the *Mudpie* line of cases.

By starting with the Virus Exclusion, focusing next on the Specified Causes Clause, and dealing with the Limited Virus Coverage grant as an afterthought, Sentinel has the proper sequence of insurance coverage analysis backward. There may be cases in which the plain terms of an exclusion unequivocally foreclose any potential for coverage, without the need to consider anything else, but this is not one of them. Here, the first question to address is whether the insured's coverage claim falls within the scope of the pertinent insuring agreement. And on this question, the reasoning in the

19

*Mudpie* line of cases cannot be transposed onto the Limited Virus Coverage grant. Unlike the undefined phrase "direct physical loss of or physical damage to" property in the Special Property Coverage Form, the key coverage-triggering phrase in the Limited Virus Coverage grant is simply "loss or damage," which is specially defined in a manner that not only contemplates the possibility a virus may "cause[]" physical damage to covered property, but that includes the costs of "removal" of "virus"—a phrase capacious enough to include cleaning the surfaces of the property—as well as testing to detect whether virus is merely "present" on the property.

Analyzing the coverage issues in proper sequence, we conclude that (1) the insuring agreement in the Limited Virus Coverage, construed in accordance with the reasonable expectations of an insured in the position of John's Grill, is broad enough to encompass forms of property "loss" that do not involve physical alteration of property; (2) John's Grill has alleged enough here to warrant giving it another opportunity to plead that its claim falls within the scope of the Limited Virus Coverage grant; (3) the Specified Causes Clause, construed and applied expansively, as Sentinel urges us to do, leaves John's Grill with what amounts to no virus coverage at all and thus is unenforceable under the illusory coverage doctrine; and (4) finally, turning to the exclusionary language Sentinel invokes—not first in the sequence of coverage analysis, but last—it is premature to say whether the Virus Exclusion applies, since that exclusion is subject to an exception wherever there is coverage under the Limited Virus Coverage provisions, and the applicability of this exception cannot be determined until the issue of coverage is ultimately decided.

b. *The Virus Exclusion and the Limited Virus Coverage Provisions: Text and Structure*

We begin our analysis with some observations about the text of the Limited Fungi or Virus Coverage Endorsement. Structurally, it has two parts. First, to the list of Exclusions set forth in the Special Property Coverage Form, Paragraph A of the Limited Fungi or Virus Coverage Endorsement adds a new exclusionary clause, the Virus Exclusion, specifying that Sentinel "will not pay for loss or damage caused directly or indirectly by . . . [¶] . . . [the] [p]resence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus."[8] Second, to the list of Additional Coverages set forth in the Special Property Coverage Form, Paragraph B of the Limited Fungi or Virus Coverage Endorsement adds a series of subparagraphs (Subparagraph B.1.a.—Subparagraph B.1.f.) titled "Limited Coverage For 'Fungi', Wet Rot, Dry Rot, Bacteria and Virus," which together set forth the terms of the Limited Virus Coverage.

The principal limitation placed on the Limited Virus Coverage is in the Specified Causes Clause, Subparagraph B.1.a. of the Limited Fungi or Virus Coverage Endorsement. This limitation—which tracks counterpart language stated as an exception to the Virus Exclusion ("But if 'fungi', wet rot, dry rot, bacteria or virus results in a 'specified cause of loss' to Covered Property, we will pay for the loss or damage caused by that 'specified cause of loss' ")— narrows the Limited Virus Coverage to circumstances where the virus is the "result of" certain enumerated "causes." For purposes of the virus-caused risks, this effectively flips the all-perils structure of the Special Property Coverage Form. The Specified Causes Clause states as follows: The Limited

---

[8] In a proviso, the Virus Exclusion states, "Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."

Virus Coverage grant "only applies when the 'fungi', wet or dry rot, bacteria or virus is *the result of* one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence. [¶] (1) A 'specified cause of loss' other than fire or lightning; [¶] (2) Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises." (Italics added.)

"Specified Cause of Loss," a defined term in Subparagraph G.19. of the Special Property Coverage Form (and the first of two conditions set forth in the Specified Causes Clause) means: "Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." "Equipment Breakdown Accident," a defined term in Subparagraph A.5.c. of the Special Property Coverage Form (and the second of two conditions set forth in the Specified Causes Clause), means, slightly paraphrased: "Mechanical breakdown," including rupture or bursting caused by centrifugal force; "Artificially generated electric current" such as arcing or other electrical disturbance affecting electrical devices, appliances or wires; or "Explosion" of or "Physical loss or physical damage" to steam boilers, steam piping, steam engines or steam turbines or hot water boilers.

The precise wording of the Limited Virus Coverage grant in Subparagraph B.1.b. of the Limited Fungi or Virus Coverage Endorsement is

22

as follows: "We will pay for loss or damage by 'fungi',[9] wet rot, dry rot, bacteria and virus. As used in this Limited Coverage, the term *loss or damage* means: [¶] (1) Direct physical loss or direct physical damage to Covered Property caused by 'fungi', wet rot, dry rot, bacteria or virus, including the cost of removal of the 'fungi', wet rot, dry rot, bacteria or virus; [¶] (2) The cost to tear out and replace any part of the building or other property as needed to gain access to the 'fungi', wet rot, dry rot, bacteria or virus; and [¶] (3) The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that 'fungi', wet rot, dry rot, bacteria or virus are present." (Italics added.)

### c. *"Loss or Damage" as Specially Defined Within the Affirmative Grant of Coverage in the Limited Fungi or Virus Coverage Endorsement*

The Limited Virus Coverage does more than simply restore pre-existing coverage that is taken away by the Virus Exclusion. Not only does it contain an affirmatively phrased insuring agreement ("We will pay for"), which is in line with the phrasing of other affirmative grants of coverage in the Policy,[10]

---

[9] "Fungi" is defined to mean "any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi." There is no definition of "virus" or any of the other perils listed in the Limited Virus Coverage grant.

[10] Compare the language of the endorsement titled "Exclusion—Fungi, Bacteria and Viruses," which modifies the Business Liability Coverage Form. It provides as follows: "This insurance does not apply to: [¶] 1. Injury or damage arising out of or related to the presence of, suspected presence of, or exposure to: [¶] a. Fungi, including but not limited to mold, mildew, and yeast; [¶] b. Bacteria; [¶] c. Viruses; or [¶] d. Dust, spores, odors, particulates or byproducts, including but not limited to mycotoxins and endotoxins, resulting from any of the organisms listed in a., b., or c. above; from any source whatsoever. [¶] 2. Any loss, cost or expense arising out of the testing

but the triggering language in the insuring agreement for the Limited Virus Coverage ("loss or damage") includes but is not restricted to "direct" and "physical" forms of loss or damage.

The term "loss or damage" is also specially defined in Subparagraph B.1.b. of the Limited Fungi or Virus Coverage Endorsement. And this special definition is more expansive than the counterpart, undefined phrase "direct physical loss of or physical damage to Covered Property" in the Special Property Coverage Form. First, by stating that "[d]irect physical loss or direct physical damage to" property can be "caused by" "virus,"[11] the special definition expressly contemplates what the *Mudpie* line of cases places outside the ambit of standard form first party trigger of coverage language: A virus can directly "cause" physical loss or physical damage to property in some circumstances.

Second, the language in a series of inclusively framed subparagraphs within the special definition of "loss or damage" extends beyond the limited scope of the trigger language in the Special Property Coverage Form in several key respects. These subparagraphs sweep within the special

---

for, monitoring of, cleaning up of, removal of, containment of, treatment of, detoxification of, neutralization of, remediation of, disposal of, or any other response to or assessment of, the effects of any of the items in 1.a., b., c. or d. above, from any source whatsoever."

This third party liability virus exclusion is subject to a simply stated exception (the "exclusion does not apply to 'bodily injury' or 'property damage' caused by the ingestion of food"), but is otherwise absolute and contains no affirmative grant of coverage. There is a virtually identical, following form exclusion for virus risk in the Umbrella Liability Supplemental Contract that also lacks an affirmative grant of virus coverage.

[11] Subparagraph B.1.b.(1). ("Direct physical loss or direct physical damage to Covered Property *caused by* . . . virus, including the cost of removal of the 'fungi', wet rot, dry rot, bacteria or virus," italics added).

definition the costs of structural mitigation work such as "tear[ing] out" and "replace[ment]" of property,[12] but go further than that. They also refer to "removal of the virus"[13]—a phrase broad enough to encompass simply wiping and cleaning surfaces—and after the mitigating "repair," "replacement" or "removal" work is done, the costs of "testing" for the "presen[ce]" of the virus is included as well, presumably to ensure that the mitigation was effective.

We think an insured in the position of John's Grill could reasonably construe this trigger language to encompass what has been alleged here. The operative complaint avers that (1) the COVID-19 virus "can spread from person to person through small droplets from the nose or mouth which are spread when a person with COVID-19 coughs or exhales," (2) "[t]hese droplets land on objects and surfaces around the person," (3) the droplets "land indiscriminately on the surfaces of property with potentially fatal consequences," (4) the insidious nature of the COVID-19 virus is that it can remain infectious on a variety of surfaces and objects from several hours to several days, and (5) on the premises at John's Grill, "every surface and object [was] implicated, including the doors and their parts, door jambs, floors and carpeting, window panes, walls, countertops, light fixtures, the hostess desk, tables, chairs, dishes, drinking utensils, flatware, the entire kitchen and cookware, bathrooms, elevator, artwork and photos, and other fixtures and moveable personal property" inside the premises.

---

[12] Subparagraph B.1.b.(2). ("The cost to *tear out* and *replace* any part of the building or other property as needed *to gain access to the . . . virus*," italics added).

[13] Subparagraph B.1.b.(1). ("Direct physical loss or direct physical damage to Covered Property caused by 'fungi', wet rot, dry rot, bacteria or virus, including the cost of *removal of the . . . virus*," italics added).

It is important to bear in mind the commercial context we are dealing with. Gathering people in a congregate setting is essential to the operation of John's Grill's business. For an enterprise of that type, the allegations of pervasive virus "presence" on property surfaces can reasonably be read to mean some type of "removal" of COVID-19 contamination by cleaning or detoxification was required, thus triggering Subparagraph B.1.b. of the Limited Virus Coverage provisions even if the mitigation steps that had to be taken did not involve physical alteration of property. As one of the leading cases in the *Mudpie* line puts the issue, " 'When the structure of the property itself is unchanged to the naked eye . . . and the insured alleges that its usefulness for its normal purposes has been destroyed or reduced, there are serious questions whether the alleged loss satisfies the policy trigger.' " (*Inns-by-the-Sea, supra*, 71 Cal.App.5th at p. 700, quoting 10A Couch on Insurance, *supra*, § 148:46.) The particular policy language in this case requires us to decide these questions in favor of the insured, just as we did in a case involving different but similarly customized language in *Amy's Kitchen, supra*, 83 Cal.App.5th at p. 1069.[14]

Wholly apart from the issue of whether John's Grill alleged "[d]irect physical loss or direct physical damage to" property, Sentinel pointed out at oral argument that John's Grill does not allege any mitigation steps were taken to remove the alleged contamination on its premises. In response, John's Grill argued that, to the extent more facts are necessary to show "loss

---

[14] See *Amy's Kitchen, supra*, 83 Cal.App.5th at pages 1069–1070 (COVID-19 virus contamination falls within trigger-of-coverage language in "communicable disease extension" specifying covered costs for " 'direct physical loss or damage' " to include " 'necessary costs incurred to [¶] . . . [¶] (c) [m]itigate, contain, remediate, treat, clean, detoxify, disinfect, neutralize, cleanup, remove, dispose of, test for, monitor, and assess the effects [of] the communicable disease' ").

26

or damage" within the special definition in Subparagraph B.1.b. of the Limited Fungi or Virus Coverage Endorsement, it should have been given leave to amend.  We must agree.  Because there is a reasonable possibility on this record that John's Grill can allege that mitigation steps were taken to remove a virus that was present on its property, the trial court abused its discretion in sustaining Sentinel's demurrer without leave to amend.

> d. *The "Loss or Damage" Mitigation Provisions (Subparagraph B.1.b.) and the Business Interruption Provisions (Subparagraph B.1.f.) Are Linked Together*

If the pervasive presence of a virus on the interior surfaces of John's Grill's premises led patrons to cease coming to its restaurant for a period of time due to the fear of contracting a potentially fatal illness—which is what is alleged here—we believe a reasonable insured would also have an expectation of coverage under Subparagraph B.1.f. for the resulting loss of its ability to use the restaurant for its intended purpose.  Subparagraph B.1.f. covers business interruption losses during a " 'period of restoration.' " A "Period of Restoration" is defined in Subparagraph G.12. of the Special Property Coverage Form to begin on the date of "physical loss or physical damage caused by or resulting from a Covered Cause of Loss" and to end when the property "should be repaired, rebuilt or replaced with reasonable speed and similar quality" or the business resumes at a new location.

Subparagraphs B.1.b. and B.1.f. are part of the same series of clauses setting forth terms of the Limited Virus Coverage and are therefore linked. The specially defined term "loss or damage" appears in both of them. Subparagraph B.1.f. affords coverage "if a Time Element Coverage applies to the 'scheduled premises' and only if the suspension of 'operations' satisfies all the terms and conditions of the applicable Time Element Coverage."  As numerous courts that have construed property insurance policies in the wake

27

of the pandemic have observed, Lost Business Income and Extra Expense coverages are forms of Time Element Coverage. (See *Cosmetic Laser, Inc. v. Twin City Fire Insurance* (D.Conn. 2021) 554 F.Supp.3d 389, 394 (*Cosmetic Laser*); *Q Clothier New Orleans LLC v. Twin City Fire Ins.* (E.D.La. 2021) 535 F.Supp.3d 574, 585.)

Sentinel acknowledges the more expansive breadth of the trigger-of-coverage language in the specially defined phrase "loss or damage," but tries to confine it strictly to Subparagraph B.1.b., leaving Subparagraph B.1.f. unaffected by the definition. We reject that argument. What Sentinel ignores is that the Limited Fungi or Virus Coverage Endorsement, by its terms—as stated in the lead-in sentence, following the title of the endorsement—"modifies insurance provided under the following: [¶] Special Property Coverage Form . . . ." That is what endorsements typically do. They modify the main body of an otherwise standardized form, thereby customizing it for purposes of the endorsement, which is an objective the parties to this insurance contract plainly had, given the tailored nature of several of the endorsements they agreed upon.

We decline to read Subparagraph B.1.b. in isolation, which would effectively give the specially defined phrase "loss or damage" in Subparagraphs B.1.b. and B.1.f. two different meanings. Instead, we think the special definition of "loss or damage" has the effect of broadening the trigger of coverage language in all provisions of the Limited Fungi or Virus Coverage Endorsement, and that the Limited Fungi or Virus Coverage Endorsement in turn modifies the Special Property Coverage Form for purposes of the endorsement—here specifically for risks of loss or damage caused by virus.

28

In another effort to wall off the Lost Business Income and Extra Expense coverage afforded by Subparagraph B.1.f. from being affected by whatever interpretation we place on Subparagraph B.1.b., Sentinel argues that Time Element Coverage is available only if " 'all the terms and conditions of the applicable Time Element Coverage' " are satisfied. And since John's Grill has not alleged "direct physical loss of or physical damage to Covered Property" sufficient to trigger coverage under the Special Property Coverage Form, so the argument goes, there cannot possibly be coverage under Subparagraph B.1.f. of the Limited Fungi or Virus Coverage Endorsement.

This position—which is where Sentinel's argument circles back to the *Mudpie* line of cases—runs as follows. According to Sentinel, when, and only when, an event of "[d]irect physical loss of or physical damage to Covered Property" occurs, there may be coverage for the costs of tearing out or replacing property to gain access to a virus or to test for a virus. Similarly, when, and only when, an event of "[d]irect physical loss of or physical damage to Covered Property" occurs which does not itself cause a suspension of business operations, but a virus does cause such a suspension, then there may be coverage under the Lost Business Income and Extra Expense Endorsement (a form of Time Element Coverage), subject to the specified limits.

We are prepared to accept, and we assume arguendo, that the insuring agreement in the Special Property Coverage Form, read on its own, without change, would have established a baseline of coverage in accordance with the *Mudpie* rule limited to loss or damage of "a *physical* nature that can be *physically* fixed, or if incapable of being *physically* fixed because it is so heavily destroyed, requires a complete move to a new location." (*Inns-by-the-*

29

*Sea, supra*, 71 Cal.App.5th at p. 707.)  But at best for Sentinel, the Policy is ambiguous when read in light of the modifications made by the Limited Fungi or Virus Coverage Endorsement.  Because the Limited Fungi or Virus Coverage Endorsement contains an *additional* affirmative grant of coverage, and because there is a special definition of "loss or damage" in the triggering clause for that additional coverage, we cannot simply import the reasoning of the *Mudpie* line of cases.  What appears to have happened here is that the parties customized the first party insurance John's Grill bought to accommodate additional coverage for losses caused by insidious, difficult to access and detect forms of property damage from fungi, wet rot, dry rot, bacteria or virus that may occur in a restaurant environment.  And under the endorsement language the parties agreed upon to accomplish this objective, the wording is broad enough to bring within the scope of coverage loss of use of property.

Sentinel is adamant that a ruling for John's Grill would run contrary to the avalanche of precedent nationwide agreeing with *Mudpie*, but we think not.  What we decide today does no more than follow the established principle that we must interpret the provisions of a contract to avoid rendering the instrument "illusory."  (*Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86, 94–95.)  Contracts of insurance do not enjoy any special exemption from that basic principle.  By insisting that *Mudpie* always supplies the bedrock rule despite the breadth of the particular insuring agreement we are dealing with, Sentinel's interpretation violates "two related principles applicable to all insurance contracts:  first, that 'the policy or its endorsements cannot be so interpreted as to become meaningless, or to withhold coverage which the [layperson] would normally expect from it . . . ,' and second, that ' ". . . [t]he courts will not sanction a construction of the

insurer's language that will defeat the very purpose or object of the insurance." ' " (*Howell v. State Farm Fire & Casualty Co.* (1990) 218 Cal.App.3d 1446, 1468 (conc. opn. of Barry-Deal, J.), disapproved on another issue, *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 7.)

Accordingly, we hold as follows: Reading Subparagraphs B.1.b. and B.1.f. of the Limited Virus Coverage in harmony with each other, and consistently with the rest of the Policy, the specially defined triggering phrase "loss or damage" in each provision encompasses virus contamination so pervasive within a covered building that the virus is present on surfaces throughout the premises, thereby requiring cleaning of the contaminated surfaces and rendering the building unfit for its intended purpose. Under this reading of the Policy, when Subparagraph B.1.b. is triggered, so is Subparagraph B.1.f., since the special definition of "loss or damage" in the Limited Fungi or Virus Coverage Endorsement broadened the scope of the Special Property Coverage Form trigger language for purposes of virus risk. Physical alteration of property is not required.[15]

To the extent the allegations of the operative complaint are inadequate to show other requisite elements of Time Element Coverage under Subparagraph B.1.f.—such as whether there was a "period of restoration" during which business operations were suspended—here again leave to amend should have been granted. The operative complaint does allege generally that "some or all of the period of John's Grill's closure [was] within the period of restoration under the Policy." It is reasonable to expect John's Grill could have alleged further particulars showing that, after coverage was

---

[15] We have no occasion to address the contention in Sentinel's supplemental briefing that Subparagraph B.1.f. does not supply an "independent" grant of coverage. We do not suggest that it does.

31

triggered under Subparagraph B.1.b., the alleged period of closure lasted until it could complete whatever "repair[]," "rebuil[ding]," or "replace[ment]" was necessary to permit a resumption of operations under safe conditions (such as the construction of a parklet or the reconfiguration of its space to permit socially distanced dining). Whether John's Grill can add specific facts in support of its allegation that there was a "period of restoration," we are unable to say because the issue was not a focus of attention in the trial court. We simply hold it was entitled to try.

e. *The Specified Causes Clause, as Sentinel Seeks To Apply It on This Record, Renders the Limited Virus Coverage "Virtually Illusory"*

To plead there is coverage under a first party insurance policy, it is not enough for an insured merely to allege a triggering event. All the "trigger of coverage" does, as we noted above in our summary of California insurance coverage principles, is show a potential for coverage. If there are conditions attached to the grant of coverage, the insured must also plead that those conditions have been met. For Sentinel, that is the crux of the matter regardless of how we interpret and apply the specially defined phrase "loss or damage" in the Limited Virus Coverage provisions. Because the operative complaint fails to allege any of the listed causes of virus in the Specified Causes Clause, we are told, John's Grill is ineligible for coverage under the Limited Virus Coverage as a matter of law. John's Grill responds that the Specified Causes Clause is written so broadly that it is effectively impossible to meet. As a result, John's Grill argues, the Specified Causes Clause renders the Limited Virus Coverage virtually "illusory" (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 760) and is therefore unenforceable.

We agree with John's Grill. Under well-established principles of contract law, " 'Words of promise which by their terms make performance entirely optional with the "promisor" . . . do not constitute a promise.' " (*Peleg v. Neiman Marcus Group, Inc.* (2012) 204 Cal.App.4th 1425, 1438.)[16] Plain and clear coverage conditions or limitations will always be enforced. (*Scottsdale Ins. Co. v. Essex Ins. Co.*, *supra*, 98 Cal.App.4th at p. 94 ["nonstandard but not unusual" clause obligating builder to obtain certificates of insurance from all subcontractors made coverage "conditional but not illusory"].) But in construing ambiguous policy language, California courts eschew interpretations of exclusionary or limiting language written so broadly as to make it optional for the insurer to recognize the existence of coverage. That, in our view, is just what Sentinel's proposed application of the Specified Causes Clause would do.

Literally read, Subparagraph B.1.a. of the Limited Fungi or Virus Coverage Endorsement is indecipherable when applied to viruses. The critical limiting phrase is that, for the Limited Virus Coverage to apply, the virus must be the "result of" one of a number of enumerated causes. But

---

[16] " 'Although such words are often referred to as forming an illusory promise, they do not fall within the present definition of promise. They may not even manifest any intention on the part of the promisor. Even if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance.' (Rest.2d Contracts, § 2, com. e, p. 10; accord, *id.*, § 77, com. a, p. 195; 1 Corbin on Contracts (rev. ed. 1993) § 1.17, p. 47.) 'One of the most common types of promise that is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of his or her performance. This unlimited choice in effect destroys the promise and makes it illusory.' (1 Williston on Contracts (4th ed. 2007) § 4:27, pp. 804–805, fns. omitted; accord, 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 230–231, pp. 264–266.)" (*Peleg*, *supra*, 204 Cal.App.4th at pp. 1438–1439.)

none of the listed causes has anything to do with the biological processes that actually cause a virus. For some of the other listed perils in Subparagraph B.1.a., it is readily apparent how they might be the "result of" an enumerated cause (e.g., wet rot resulting from water damage). Not so for viruses. Only if the words are taken to refer to circumstances in which a specified cause is a *vector for transmission of a virus* does the language begin to make any sense in the context of this particular peril. But that is not what the words say, and more importantly, it is not the only interpretation to which the phrase "result of" is reasonably susceptible. Pathogenic causation—in the sense that, say, cancer may be said to be the "result of" a toxic carcinogen—is another perfectly reasonable interpretation that could be adopted,[17] and it tends to favor John's Grill's contention that the Specified Causes Clause is impossible to meet. The applicable principles for interpreting insurance contracts do not compel us to resolve the ambiguity by placing a gloss on the text of the Policy, friendly to Sentinel, so that Subparagraph B.1.a. makes sense as applied.

Sentinel's first pass at this issue is to wave it off by pointing out that we are dealing not just with virus coverage, but as more fully stated in the title of the endorsement, with "Limited Fungi, Bacteria *or* Virus Coverage"

_____

[17] Causation in the pathogenic sense is a well-known standard in tort law scenarios where the decisional focus is on whether microscopic particulates "cause" disease. (See *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982 [asbestos exposure].) The operative complaint can be reasonably read to rely upon this theory of causation. John's Grill alleges that "viruses are unique in that they cannot reproduce without access to a living host cell, whereas the other agents covered by the Policy's [Limited Virus Coverage] can and often do reproduce outside a host organism, such as when fungus or mold spores land in a humid environment, reproduce, grow, and proliferate. By contrast, a virus may survive briefly outside a host organism (such as when virus is shed), but it cannot reproduce there."

(italics added). Given the disjunctive phrasing in the covered risks, Sentinel argues, so long as there is a possibility of coverage under some combination of covered risks and specified causes (e.g., wet rot caused by water damage), the illusory coverage doctrine does not apply. We reject that argument. It not only flies in the face of the principle that we must give effect to all the words of the Policy, but is precisely the kind of "heads I win, tails you lose" position the illusory coverage doctrine forbids. (Cf. *Energy Ins. Mutual Limited v. Ace American Ins. Co.* (2017) 14 Cal.App.5th 281, 306 [comprehensive general liability coverage afforded under umbrella liability policy not "completely withdraw[n]" for claims arising from failure to provide professional services, since grant of coverage was not for errors and omissions liability].) Insurers cannot take in premium for a coverage grant that names a specifically covered risk—here virus contamination—and then justify denying coverage for it under all circumstances because some other risk may be covered under the same coverage grant.

Sentinel's fallback argument is that, if we squint hard enough, the Limited Virus Coverage grant, as narrowed by the Specified Causes Clause, does indeed provide for a sliver of coverage, which is why the coverage is described as "Limited." According to Sentinel, it is conceivable a virus can be the "result of" one of the enumerated perils and then cause property loss or damage, though those circumstances may be exceedingly rare, even freakish. We are then asked to imagine how. "It is . . . easy to imagine a virus resulting from other specified causes of loss," Sentinel tells us. "For example, 'water damage' could result in waterborne viruses infecting property, including plant[s] or animals. 'Vandalism' might also cause a virus to spread on property, causing physical loss or damage to living property. And even if it were impossible for a virus to result from a specified cause of loss, the

35

Limited Coverage would still not be illusory if an equipment breakdown could cause a virus to spread on property."

We do not think these possibilities are so easy to see. Focusing on the precise text of the Specified Causes Clause, we explored some of them with counsel at oral argument. The scenario of an equipment breakdown led nowhere, as it quickly became apparent during our colloquy with counsel that while, for example, a malfunctioning air conditioning system might in theory create a heightened risk of airborne disease transmission within a building (as with, say, Legionnaires' disease), that scenario would involve risk to people—and hence implicate liability coverage, not property coverage—so it led back to the essential problem of whether a virus can ever cause the alteration of, and thus damage to, property. Other than problems with an air conditioning system, Sentinel has suggested no other scenario in which "Equipment Breakdown Accident" might lead to virus-caused loss or damage, presumably because the definition of "Equipment Breakdown Accident" speaks of explosions, electrical arcing, rupture, or bursting of various machinery, events which have no demonstrable connection to the spread of a virus or any other microbial phenomena, even if we were to interpret the phrase "result of" generously to refer to vectors of virus transmission.

When pressed for more and better examples at oral argument, Sentinel's counsel retreated to the theme that there might be any number of scenarios in which a virus could damage "living property." To illustrate how this could occur, Sentinel's counsel cited *Curtis O. Griess & Sons v. Farm Bur. Ins.* (Neb. 1995) 528 N.W.2d 329, a first party insurance version of *Palsgraf v. Long Island R. Co.* (1928) 162 N.E. 99, but without the universally recognized legal significance that a weird causation scenario provided there. *Griess*, a more quotidian case, is best limited to its peculiar

36

factual context. There, a farmer in Nebraska claimed coverage under a first party policy for the value of his pigs after the animals became sick and died when, due to a windstorm, a virus from a neighboring farm infected them. The court held that, "where a virus has been transmitted by means of a covered peril, the covered peril has been held to be the proximate cause of the loss," citing an Iowa case, *Qualls v. Farm Bureau Mutual Insurance Company* (Iowa 1971) 184 N.W.2d 710, in which "14 heifers owned by the insured died of pseudorabies transmitted by wild animals which had attacked the heifers." (*Griess*, *supra*, 528 N.W.2d at p. 333, quoting *Qualls*, *supra*, 184 N.W.2d at p. 712.) Under the efficient loss causation rule in those states, these courts found that there was coverage for "living property" despite the attenuated chain of causation that led to the claimed losses at issue.

We fail to see what these oddball scenarios have to do with this case. Even if *Griess* could be read to support a reading of the phrase "result of" that means vector of viral transmission, there is still the matter of finding some nexus to property loss or damage, which is presumably why Sentinel emphasizes the risk to "living property" that *Griess* illustrates. But John's Grill is not a farm, and even assuming pets may be found on its premises from time to time, coverage is afforded for animals under the Policy only if "[t]hey are owned by others and boarded by you, or owned by you and held for sale or sold but not delivered." If John's Grill were operating a dog kennel or a pet store, perhaps the *Griess* case might have some relevance, but not on the actual business circumstances we are dealing with here. Nor is it self-evident to us that plant viruses may be transmitted through the same vectors of transmission that we intuitively associate with human disease (after all, plants do not ingest water or breathe in the same way humans do), but even if plant viruses may be transmitted by air or water, we have no idea whether

37

plants are, in fact, part of the covered property environment on John's Grill's premises. So in the end, all *Griess* shows is that it is possible to conjure up many scenarios that might notionally pose a risk of damage to some form of "living property" for some businesses. But on this record, none of these abstract risks bear on the insurance policy Sentinel underwrote for *this* insured.

The parties argue back and forth about how unlikely coverage must be in order to justify application of the illusory coverage doctrine. Sentinel suggests that John's Grill is simply complaining it is "hard" to show that a claim falls within the Limited Virus Coverage, while John's Grill urges us to hold that it has "no realistic prospect" of benefitting from the Limited Virus Coverage. According to John's Grill, it "is misleading and contrary to the reasonable expectations of the insured to market an endorsement" with the word virus in the "title if there is no realistic prospect it will ever pay out a claim for losses caused by virus." We are disinclined to transform the doctrine of illusory coverage into a species of false advertising by tying it to how a policy was "marketed," but we agree that the test for illusory coverage must focus on objective reality and the insured's reasonable expectations of coverage. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 874.) Imaginary exercises involving pigs caught in windstorms and cows encountering wild animals will not do.

It takes more than a "a mere drafting fiction" to overcome a well-pleaded illusory coverage argument. (*Julian v. Hartford Underwriters Ins. Co.*, *supra*, 35 Cal.4th at p. 760.) Where an insured properly raises the issue of illusory coverage, as John's Grill has done here, unsubstantiated speculation, untethered to the insured's actual business circumstances as underwritten by the insurer, is not enough to defeat the argument. (Cf.

*Blackhawk Corp. v. Gotham Ins. Co.* (1997) 54 Cal.App.4th 1090, 1096–1097 [in light of insured's actual business "as developer of raw land," subsidence exclusions not illusory when applied to housing development on property sold by insured].) Because Sentinel has not proffered enough to demonstrate a realistic prospect of John's Grill ever benefitting from the Limited Virus Coverage based on events the parties might reasonably have anticipated during the Policy period, we agree that Sentinel has, "through sweeping language," rendered the Policy's virus coverage terms "virtually illusory." (*Julian, supra*, at p. 756.)

f. *We Decline To Apply The Federal Case Law Cited by Sentinel*

Sentinel claims that "dozens of courts—in California and across the country—have agreed with the superior court that th[e] *exact* 'Virus Exclusion' " found in its Policy " 'unambiguously forecloses coverage of . . . alleged losses due to either COVID contamination or the Closure Orders.' " It claims further that "[t]hese decisions join dozens more that have found that similar 'virus exclusions clearly and without doubt preclude coverage for the losses and expenses alleged by' businesses forced to shut down due to the coronavirus and related closure orders." Half of this argument is correct. If all we had to do here was apply an absolute, unqualified exclusion, without an affirmative grant of coverage, the body of case law Sentinel relies upon would likely be dispositive. But we have more than that. At oral argument, Sentinel lowered the number of cases applying the same Limited Fungi or Virus Coverage Endorsement at issue in this case down from "dozens" to seventeen in total,[18] and of those cases, nine have applied California

---

[18] All of these cases appear to involve Sentinel, Twin City Fire Insurance Company, or Hartford Fire Insurance Company, each of which is an affiliated company in the HFSG family of Hartford companies, a finding

39

insurance coverage law.[19]  This appears to be the body of case law to which Sentinel refers in claiming that "every California court to address" the illusory coverage argument made by John's Grill has rejected it.  The cases are all non-binding decisions from federal district judges sitting in diversity.

The district judges in the nine cases applying California law take various analytical routes to rejecting the coverage theory asserted by John's Grill under the Limited Fungi or Virus Coverage Endorsement.  Some of the opinions construe the Policy to require physical alteration of property under the *Mudpie* line of cases, thus in effect giving the trigger clause in the Limited Virus Coverage no greater breadth than the coverage trigger in the main first party coverage grant, and failing to recognize that the special

that the trial court in this case made with respect to Sentinel and that we see trial courts have made elsewhere with respect to Twin City Fire and Hartford Fire.  (See, e.g., *Rosalez v. Hartford Financial Services Group, Inc.* (D.Ariz., Feb. 3, 2021, No. CV-20-00766-PHX-JJT) 2021 WL 363856.)

[19] *Barbizon School of San Francisco, Inc. v. Sentinel Ins. Co., Ltd.* (N.D.Cal., Dec. 3, 2021, No. 20-cv-08578-TSH) 2021 WL 5758890; *Mostre Exhibits, LLC v. Sentinel Ins. Co., Ltd.* (S.D.Cal., Oct. 15, 2021, No. 20-cv-1332-BAS-BLM) 2021 WL 4819411; *Protégé Restaurant Partners LLC v. Sentinel Ins. Co., Ltd.* (N.D.Cal., Sept. 28, 2021, No. 20-cv-03674-BLF) 2021 WL 4442652, *4, affd. (9th Cir. 2022) 2022 WL 14476377 (mem. opn.); *Ets-Hokin v. Sentinel Ins. Co., Ltd.* (N.D.Cal., Aug. 27, 2021, No. 20-cv-06518-JST) 2021 WL 4472692; *Hair Perfect International, Inc. v. Sentinel Ins. Co., Ltd.* (C.D.Cal., May 20, 2021, No. LA CV20-03729 JAK (KSx)) 2021 WL 2143459; *French Laundry Partners, LP v. Hartford Fire Ins. Co.* (N.D.Cal. 2021) 535 F.Supp.3d 897 (*French Laundry*); *Westside Head & Neck v. Hartford Fin. Servs. Group* (C.D.Cal. 2021) 526 F.Supp.3d 727; *Colgan v. Sentinel Ins. Company, Ltd.* (N.D.Cal. 2021) 515 F.Supp.3d 1082 (*Colgan*); *Franklin EWC, Inc. v. Hartford Fin. Servs. Group* (N.D.Cal. 2020) 506 F.Supp.3d 854 (*Franklin EWC*).

definition of "loss or damage" creates ambiguity.[20]  Some say that any
conceivable "possibility of coverage" is enough to defeat the illusory coverage
doctrine, either accepting the *Griess* case as an example of how the grant of
Limited Virus Coverage might be triggered,[21] or accepting the idea that any
potential for coverage for one peril in a multi-peril grant of coverage is
enough to show the requisite possibility of coverage,[22] or both.  Some
complete their coverage analysis by invoking the Virus Exclusion without
considering the principle that exclusions are construed narrowly and
exceptions to exclusions are construed broadly, and without addressing the
illusory coverage doctrine at all.[23]  And some rule on a combination of these
grounds, with most of the cases citing to one another.[24]

We reach a different conclusion at each step of the analysis.  We
recognize that the nine cases Sentinel cites are in line with a number of
federal district court opinions in diversity cases across the country that have
applied the same Limited Fungi or Virus Coverage Endorsement form we are
dealing with, but we find none of the others any more persuasive than the

---

[20] See, e.g., *Mostre Exhibits, LLC v. Sentinel Ins. Co., Ltd.*, *supra*, 2021 WL 4819411 at pages *6, *8; *Colgan*, *supra*, 515 F.Supp.3d at pages 1086–1087.

[21] See, e.g., *French Laundry*, *supra*, 535 F.Supp.3d at pages 903–904; *Franklin EWC*, *supra*, 506 F.Supp.3d at page 861.

[22] See, e.g., *Barbizon School of San Francisco, Inc. v. Sentinel Ins. Co., Ltd.*, *supra*, 2021 WL 5758890 at page *9.

[23] See, e.g., *Colgan*, *supra*, 515 F.Supp.3d at page 1088.

[24] See, e.g., *Ets-Hokin v. Sentinel Ins. Co., Ltd.*, *supra*, 2021 WL 4472692 at page *2; *French Laundry*, *supra*, 535 F.Supp.3d at pages 903–904; *Franklin EWC*, *supra*, 506 F.Supp.3d at pages 860–861; *Hair Perfect International, Inc. v. Sentinel Ins. Co., Ltd.*, *supra*, 2021 WL 2143459 at page *9; *Westside Head & Neck v. Hartford Fin. Servs. Group*, *supra*, 526 F.Supp.3d at pages 733–734.

diversity cases from California.  Rather than deal with all the non-California cases applying the Limited Fungi or Virus Coverage Endorsement form, we will treat one particular case, *Cosmetic Laser*, *supra*, 554 F.Supp.3d 389, as illustrative because it is one of the more thoroughly reasoned and frequently cited of the cases of its type.  In our view, *Cosmetic Laser* highlights particularly well why this vein of precedent cannot be transplanted to California.

Applying Connecticut and Ohio law, the *Cosmetic Laser* court first analyzes the Virus Exclusion, and finds its exclusionary language clear and unambiguous.  (*Cosmetic Laser*, *supra*, 554 F.Supp.3d at p. 401 & fn. 9.)  It then goes on to say that the insured's proposed reading of Subparagraph B.1.f.—the Time Element Coverage clause—"would swallow the Virus Exclusion as a whole." (*Cosmetic Laser*, at p. 404.)  The court explains:  "The Virus Exclusion begins by firmly stating that loss or damage resulting from a virus 'is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.' " (*Ibid*.)  After observing that "Cosmetic Laser's interpretation of Subsection B.1.f. would conflict with the function of the Virus Exclusion" (*ibid*.), the court concludes as follows:  "On [the insured's proposed] reading, *that same Virus Exclusion*, just one page later, would grant coverage—without limitation—for suspension of business operations due to a virus.  I will not 'read[] the Limited Coverage provision in the Virus Exclusion to subsume the Policy and the exclusion, itself' " (*ibid*., italics added).

We have no reason to delve into whether the principles of Connecticut law, Ohio law, and California law are the same.  We also recognize that the insured in *Cosmetic Laser* made different arguments in favor of coverage than John's Grill does, but that court's conflation of the Virus Exclusion and

the Limited Virus Coverage grant demonstrates why a different analysis is required here. What the *Cosmetic Laser* court perceived as an internal conflict between the Virus Exclusion and the Limited Virus Coverage grant (at least as it was proposed to be construed by the insured there) is easily resolved under California law by giving primacy to the insuring agreement in the Limited Virus Coverage provisions, broadly read, and dealing with the Virus Exclusion, narrowly read, only after completing the first step of the analysis (since the Virus Exclusion is inapplicable by its plain terms wherever there is Limited Virus Coverage).

Instead, the *Cosmetic Laser* court gave primacy to the Virus Exclusion, and went on from there, never directly addressing the full scope of the coverage grant in the Limited Virus Coverage provisions. This approach to analyzing the Limited Fungi or Virus Coverage Endorsement—which happens to be the same general approach Sentinel persuaded the trial court to take in this case (probably not coincidentally, since counsel for the insurer in *Cosmetic Laser* is also counsel for Sentinel in this case)—follows the organization of the endorsement itself: Virus Exclusion first, Specified Causes Clause second, Limited Fungi or Virus Coverage provisions third. But the layout of the Limited Fungi or Virus Coverage Endorsement cannot dictate the proper approach to analyzing coverage. The legal analysis we must apply is governed by settled principles of insurance contract interpretation, not by the format of the endorsement. Using the Limited Fungi or Virus Coverage Endorsement as a self-contained map to the analysis effectively treats it in isolation from the rest of the Policy, contrary to those principles.

That is not how we proceed in this state. The sequence of analysis matters. Because insuring agreements and exceptions to exclusions are to be

43

read broadly in favor of coverage, the key question here is not whether the Limited Virus Coverage would swallow the Virus Exclusion, which was a stated concern of the *Cosmetic Laser* court. Rather, it is just the opposite. Under California law we are concerned with giving an affirmative grant of coverage its fullest reach, in accord with its text and structure, while bearing in mind that ambiguities must be resolved in accordance with the reasonable expectations of the insured. The applicability of the Virus Exclusion may be determined only after that threshold question is answered, keeping in mind the exclusion is to be given narrow scope.

## III. DISPOSITION

The judgment is affirmed in part (as to HFSG) and reversed in part (as to Sentinel) and remanded for further proceedings, if any are warranted following the reported settlement. The parties are to bear their own costs on appeal.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
GOLDMAN, J.

44

Trial Court:   Superior Court of California, County of San Francisco

Trial Judge:   Hon. Ethan P. Schulman

Counsel:   Cotchett, Pitre & McCarthy, Nanci E. Nishimura, Brian Danitz, Andrew F. Kirtley, Julia Q. Peng, for Plaintiffs and Appellants.

Steptoe & Johnson, Anthony J. Anscombe; Wiggin and Dana, Tadhg Dooley, David R. Roth, for Defendants and Respondents.